IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VICTORIA PROCTOR, | ) |
| Plaintiff, | ) |
| v. | ) No. 04 C 3889 |
| BOARD OF EDUCATION, SCHOOL DISTRICT 65, EVANSTON, ILLINOIS, SUSAN SCHULTZ, DR. HARDY R. MURPHY, DR. LYNN MCCARTHY, and MARY RITA LUECKE, | ) Judge Robert W. Gettleman |
| Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Victoria Proctor has brought a three count complaint against her former employer, the Board of Education of School District 65 of Evanston, Illinois ("the District") and Susan Schultz, Principal of Martin Luther King Laboratory School ("King Lab"), Dr. Hardy R. Murphy, Superintendent of the District, Dr. Lynn McCarthy, Assistant Superintendent of the District, and Mary Rita Luecke, President of the Board, alleging a violation of 42 U.S.C. § 1983 against all defendants (Count I); breach of contract against the District (Count II) and defamation against Luecke and Schultz (Count III). In a joint motion, the District has moved to dismiss Count II and Luecke and Schultz have moved to dismiss Count III. For the reasons set forth below, both motions are granted.[1]

---

[1] Defendants have filed a separate motion for summary judgment with respect to Count I.

## FACTS[2]

Plaintiff is a tenured teacher who taught in the District for 18 years. She taught at King Lab from 1976 to 1978 and again from 1988 until December 17, 2003. She taught language arts and social studies during her entire career at the District and by all accounts is a superior teacher.

On December 3, 2003, plaintiff and two colleagues hung a model skeleton wearing a No. 23 Michael Jordan jersey from the ceiling in the teachers' lounge. Taped on to the jersey was a hand lettered sign that read "Not much life BUT . . . I passed the TAASS Test NCLB." The display was intended as a criticism of the federal No Child Left Behind Act ("NCLB"). Two days later, after noticing that the sign had been removed from the skeleton, plaintiff sent an e-mail to all King Lab staff objecting to the removal. That same day three African-American teachers at King Lab approached plaintiff and her two colleagues to express concern that the display could be misinterpreted as a lynched African-American person. Plaintiff explained the intent of the display, apologized for any misunderstanding, and offered to send a letter of apology to the staff. Plaintiff and her colleagues thereafter removed the display from the teachers' lounge.

Four days later, on December 9, 2003, plaintiff and her colleagues were called into Principal Schultz's office to discuss the matter. At that time Schultz indicated that she was personally offended by the negative reference to NCLB. Schultz and Assistant Principal Mutchnick then sent a letter to all King Lab staff indicating that the incident had been addressed

---

[2]The facts are taken from plaintiff's first amended complaint and are presumed true for purposes of defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Travel All Over The World, Inc. v. Kingdom Of Saudi Arabia, 73 F3d 1423 (7th Cir. 1996).

2

and hoping that "we can put this unfortunate incident behind us and move forward to fulfill our mission as a school. By working together we can accomplish a great deal."

On December 11, 2003, plaintiff sent Schultz a letter responding to Schultz's comments at the December 9 meeting and expressing plaintiff's concern over Schultz's "seeming disregard for freedom of expression." The following day, Schultz sent a letter to McCarthy, formally requesting plaintiff's immediate transfer from King Lab "based on the recent events that have occurred at King Lab." That same day, Schultz prepared a letter to plaintiff summarizing the events up to that point and indicating that she was personally offended by plaintiff's comments about the No Child Left Behind Act. This letter, which was delivered the following Monday on December 15, 2003, indicated that "any further actions of this nature will result in a recommendation for disciplinary action" and that "I look forward to moving beyond this incident." The letter made no mention of Schultz's request to McCarthy that the District transfer plaintiff. Similar letters were delivered to plaintiff's colleagues involved in the incident. These letters (the "reprimand letters") were placed in the teachers' personnel files.

On December 17, 2003, the District transferred plaintiff (but not her colleagues) to a teaching position at another school, assigning plaintiff to teach students who had been suspended or expelled from other schools, because her "interactions with the principal, colleagues, and parents have not demonstrated teamwork, have damaged school culture, and have created a distraction to the institutional program." Plaintiff opposed the transfer (which she alleges was punitive) and appealed the decision to the school board, which reaffirmed the decision to transfer her. Board President Luecke stated during an open board meeting that the skeleton incident was not the only reason for plaintiff's transfer. Luecke's comments did not elaborate on the reasons

for plaintiff's transfer or include any statements that were critical of plaintiff. Schultz made similar comments.

In addition to appealing the involuntary transfer to the school board, plaintiff also grieved it through the process articulated in the Collective Bargaining Agreement between the District and the District 65 Educators' Council (the "Council"). The grievance was settled by the District and the Council on June 3, 2004. Plaintiff was not consulted about and did not agree to the settlement, which provided that the reprimand letters would be removed from the teachers' personnel files if the teachers complied with certain conditions, and also contained certain "concessions which would benefit [the Council's] members in future disputes," but not plaintiff. Finally, on April 2, 2004, plaintiff was reassigned to a new school to teach learning disabled students. Plaintiff alleges that this reassignment is a further punitive and involuntary transfer. On June 7, plaintiff submitted what she terms her "involuntary resignation from the District." She alleges this resignation was directly caused by a constructive discharge by the District.

## DISCUSSION

### Count II– Breach of Contract

In Count II, plaintiff alleges that the District has breached the Collective Bargaining Agreement ("CBA") by censoring plaintiff's freedom of expression and involuntarily transferring her on two separate occasions. The District argues that Count II should be dismissed because the grievance settlement is a final and binding decision and, even if not, this court lacks jurisdiction over the claim.

The CBA provides that any claim by a teacher that there has been a violation or misapplication of the terms of the agreement shall be a grievance. The CBA contains a three step

4

grievance procedure. Within 20 days after the event giving rise to the grievance the teacher or the Council presents the grievance in writing to the supervisor immediately involved. There is a meeting between the teacher, supervisor and Council representative. The supervisor then provides a written answer within five days of the meeting.

If the grievance is not resolved at step one, then the Council refers the grievance to the Superintendent. The Superintendent then meets with the Council's Grievance Committee at which time witnesses are presented. After that hearing, the Superintendent has eight days to provide a written decision to the Council.

If the Council is not satisfied with the decision in step two, the Council may submit the grievance to final and binding arbitration with the American Arbitration Association ("AAA").

Plaintiff's grievance was submitted to binding arbitration with the AAA pursuant to step three. The grievance was settled on June 3, 2004, and the arbitration was canceled. The District argues that the settlement of the arbitration is a final and binding order preventing relitigation in this court. See United Parcel Service v. International Brotherhood of Teamsters, 1998 WL 699670 at *7 (N.D. Ill. 1998).

Plaintiff does not dispute that a settlement of a grievance submitted to binding arbitration can constitute a final decision. Instead, plaintiff argues that because the Council converted plaintiff's grievance into a class grievance, and pursued it as a means to achieve benefits for the union membership as a whole rather than strictly on plaintiff's behalf, she was not a "party" to the grievance and cannot be bound by the settlement. To support this argument plaintiff cites Vaca v. Sipes, 386 U.S. 171, 177 (1967), for the proposition that when a union breaches its duty

5

of fair representation to its member, the member is not barred from pursuing her remedy in court against a third party.

In Vaca, a union member who had been discharged from his employment allegedly in violation of a collective bargaining agreement, brought a class action in Missouri state court against his national and local unions, alleging that the unions breached their duty of fair representation by refusing to take his grievance to arbitration. The trial court held that the gravamen of the plaintiff's complaint was "arguably and basically" an unfair labor practice under § 8(b) of the National Labor Relation Act ("NLRA"), 29 U.S.C. § 158(b), within the exclusive jurisdiction of the National Labor Relation Board ("NLRB"). The Court of Appeals affirmed, but the Supreme Court of Missouri reversed. The United States Supreme Court granted certiorari and determined that the state courts had jurisdiction, but held that federal law applied and reversed because the lower courts had not applied the proper federal standards. In reaching its conclusion, the Vaca Court was cognizant of the import its decision would have on an employee's attempt to sue an employer for wrongful discharge when faced with a defense of failure to exhaust contractual remedies. Id. at 186. In particular, the Court noted that judicial enforcement of an employee's contractual rights is appropriate in instances when the union has the sole power under the contract to invoke the higher stages of the grievance procedure and, as alleged in the instant case, the employee/plaintiff has been prevented from exhausting remedies by the union's wrongful refusal to process the grievance. Id. Thus, the Court concluded that the courts had jurisdiction over suits against the union for breach of the duty of fair representation and suits against the employer for breach of the employment agreement. Id. at 186-87.

Vaca was decided under the LMRA, however, while the instant case is governed by the Illinois Educational Labor Relations Act, 115 ILCS § 5/1 et seq. Although the two statutory schemes are similar, there is, as is recognized in Cessna v. City of Danville, 296 Ill.App.3d 156, 162-63 (4th Dist.1998) (and cases cited therein), at least one significant difference. In the federal scheme, the general counsel of the NLRB had unreviewable discretion to refuse to institute an unfair labor practice complaint. This lack of judicial review was of primary concern to the Vaca court. Vaca, 386 U.S. at 182-83. In contrast, the Illinois scheme sets forth explicit standards by which the Illinois Labor Relations Board must determine whether to issue an unfair labor practice complaint, and the decision by the Board's executive director not to issue a complaint is appealable to the Board and ultimately to the appellate court on administrative review. This distinction has led the Illinois courts to conclude that the Board has exclusive jurisdiction over all matters involving collective bargaining agreements, including claims for breach of such agreements. Cessna, 298 Ill.App.3d at 162-68 (and cases cited therein).

For these reasons, the court concludes that it lacks subject matter jurisdiction over plaintiff's claim for breach of the collective bargaining agreement. Therefore, Count II is dismissed without prejudice.

## Count III– Defamation

In Count III plaintiff alleges defamation per se against Luecke and Schultz. A statement is defamatory per se if it is "so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary." Owen v. Carr, 113 Ill.2d 273, 277 (1986). Under Illinois common law, four categories of statements are considered defamatory per se: "1) words that impute the commission of a criminal offense; 2) words that impute infection with a

7

loathsome communicable disease; 3) words that impute an inability to perform or want of integrity in the discharge of duties of office or employment; or 4) words that prejudice a party or impute lack of ability in his or her trade, profession or business." Bryson v. News America Publications, Inc., 174 Ill.2d 77 (1996).

Even if a statement fits into one of the four categories, however, it is not actionable if it is reasonably capable of an innocent construction. Chapski v. Copley Press, 92 Ill.2d 349 (1982). In Illinois, the "innocent construction rule requires courts to consider a written or oral statement in context, giving the words, and their implications, their natural and obvious meaning. If, so construed, a statement 'may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable per se.'" Bryson, 174 Ill.2d at 90 (quoting Chapski, 92 Ill.2d at 352). Whether a statement is defamatory per se or is reasonably susceptible to an innocent interpretation is a question of law for the court to decide. Bryson, 174 Ill.2d at 90.

The instant complaint identifies a number of statements made by Luecke and Schultz, but does not specifically identify which of the statements are alleged to be per se defamatory. In her brief, plaintiff identifies statements made by Luecke and Schultz at a public meeting of the District in response to a question posed by a member of the public. Luecke is alleged to have stated that the reason for the transfer was "not just the skeleton matter . . . I do know, it was more than this event," that it "did not involve her opposition to federal testing requirements," and was not "based on an expression of free speech or opposition to the No Child Left Behind Act." Shultz is alleged to have stated that the transfer "had nothing to do with No Child Left Behind, freedom of speech or any one incident."

According to plaintiff, these statements "impute an inability to perform or a want of integrity in the discharge of plaintiff's duties as a teacher, or constitute words that impute a lack of ability as a teacher. Plaintiff reaches this conclusion by arguing that because the transfer was obviously punitive, any indication that there were additional unspecified reasons for the transfer indicate that plaintiff was guilty of "indiscretions or poor performance."

The court disagrees. First, nothing in the statements even remotely indicate that plaintiff lacks ability as a teacher. Nor do any of the statements indicate in any way that plaintiff lacks integrity or honesty. Given their natural meaning, in light of the circumstances, the words mean precisely what they said: that there was more than one reason for the transfer. They do not necessarily indicate that those reasons were a lack of honesty, integrity or ability. They could just as easily mean that there was a personality conflict between plaintiff and the other teachers or her supervisors. There are many reasons why a teacher may be transferred; not all necessarily reflect adversely on the teacher's ability or integrity.

Plaintiff's reliance on Colston v. Stieg, 86 Ill.App.3d 993 (2nd Dist. 1980), is misplaced. In Colston, a former college associate professor sued his department chairman for defamation based on the chairman's statement that "I have information I cannot divulge which reflects adversely on John's performance as a teacher." The Colston court held that stripped of all innuendo the statement was "a plain statement made by the defendant to the personnel committee that he was in possession of material not before the committee which would tend to prove the plaintiff to be incompetent as a teacher," obviously impugning the plaintiff in the performance of his duties and incapable of any innocent meaning. Id. at 997. In contrast, the statements allegedly made by Luecke and Schultz make no reference to plaintiff's abilities as a teacher and

9

simply indicate that there were other factors that lead to the transfer decision. Accordingly, the court concludes that the alleged statements are reasonably capable of an innocent construction and are not defamatory per se. Therefore, defendants' motion to dismiss Count III is granted.

## **CONCLUSION**

For the reasons set forth above defendants' motion to dismiss Counts II and III is granted. The status report scheduled for February 3, 2005 is stricken. The case remains set for a report on status on May 26, 2005 at 9:00 a.m.

**ENTER:** **January 25, 2005**

_____
**Robert W. Gettleman**
**United States District Judge**