IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VICTORIA PROCTOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 04 C 3889 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| BOARD OF EDUCATION, SCHOOL DISTRICT ) | |
| 65, EVANSTON, ILLINOIS; SUSAN SCHULTZ; ) | |
| DR. HARDY R. MURPHY; and DR. LYNN ) | |
| MCCARTHY, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Victoria Proctor has sued her former employer, the Board of Education of School District 65 of Evanston (the "District") and Susan Schultz, Principal of Martin Luther King Lab School ("King Lab"), Dr. Hardy R. Murphy, Superintendent of the District, and Dr. Lynn McCarthy, Assistant Superintendent of the District, alleging that she was involuntarily transferred from her teaching position in violation of the First Amendment. Defendants have moved for summary judgment. Because the facts material to the issues remain in dispute, the motion is denied.

## FACTS

Despite the reams of paper filed by both sides, only the most basic underlying facts are undisputed. Plaintiff is a tenured teacher who taught in the District for 18 years. She was assigned to teach at King Lab from 1976 to 1978 and again from 1988 until December 17, 2003,

when she was transferred as a result of the incident in question. She taught language arts and social studies during her entire career at the District and is undisputably a superior teacher.

On December 3, 2003, plaintiff and two other teachers, Tom Simms and Louise Sprengelmeyer, placed a model skeleton wearing a No. 23 Michael Jordan jersey in the teacher's lounge. Taped onto the jersey was a hand-lettered sign that read "not much life BUT . . . I passed the TAASS test NCLB." The display was intended as a criticism of the federal No Child Left Behind Act ("NCLB"). Two days later, after noticing that the sign had been removed from the skeleton, plaintiff sent an e-mail to all King Lab staff objecting to the removal. The display was then moved by Simms so that it hung by a rope near the ceiling. Simms also added a new sign stating "not much life here . . . but I passed the TAASS test NCLB" and "I'm a 'Texas scholar' Hey . . . isn't that an oxy_moron_." That same day, December 5, 2003, three African-American teachers at King Lab approached plaintiff and her two colleagues to express concerns that the display could be misinterpreted as a lynched African-American person. According to plaintiff, she explained the intent of the display, apologized for any misunderstanding, and offered to send a letter of apology to the staff. According to at least one of the African-American teachers, Ms. Aristide, plaintiff never apologized and suggested that it was their fault that they felt offended. Plaintiff and her colleagues then removed the skeleton from the teacher's lounge.

On December 8, 2003, Ms. Aristide's classroom window was broken with a brick and a computer was stolen. The police were called, and Ms. Aristide believed that the incident was related to the skeleton display, although she had no evidence on which to base that belief. That day, Pat Gregory from the Black Caucus came to King Lab to inquire about the incident. It is not clear from the record how Ms. Gregory learned of the incident.

2

The following day, plaintiff, Simms and Sprengelmeyer met with Schultz and Assistant Principal Faythe Mutchnick to discuss the incident. The parties present vastly different versions of what was said in that meeting. Plaintiff claims that Schultz specifically stated that she was personally offended by plaintiff's criticism of NCLB and that anyone interested in social justice or serving poor African-American students, or special education students should not, and could not, oppose the law. Schultz denies plaintiff's characterization of the meeting. The next day Schultz sent a memorandum to all King Lab staff detailing the history of the incident and indicating that "this situation has been addressed with those involved. . . . "It is our hope that we can put this unfortunate incident behind us and move forward to fulfill our mission as a school. By working together, we can accomplish a great deal."

On December 11, 2003, plaintiff sent Schultz a letter responding to Schultz's comments at the December 9 meeting and expressing plaintiff's concern that Schultz apparently believed that plaintiff was not interested in serving "poor black kids nor special ed students" if plaintiff did not support NCLB. Schultz received this letter late in the day on December 12, 2003. Also on December 12, 2003, Schultz sent plaintiff, Simms and Sprengelmeyer each a letter dated December 12, but apparently drafted earlier, responding to the incident. That letter, which Schultz placed in each teacher's mailbox prior to her receiving plaintiff's letter, indicated Schultz's concern with the teachers' judgment when placing the display in the teacher's lounge.

3

The letter also indicated:

> In the future, I am hopeful that you will use good judgment in your actions and communications. There are consequences for your actions, regardless of your intention. Any further actions of this nature will result in a recommendation for disciplinary action.
>
> . . .
>
> I look forward to moving beyond this incident.

Schultz has testified that after receiving plaintiff's December 11, 2003, letter she and Faythe Mutchnick determined that they could no longer work with plaintiff. Schultz left King Lab and went to the Central Office and spoke with Murphy and McCarthy and Personnel Director Helen Mardis, asking that plaintiff be transferred at that time. Murphy indicated that he would support the transfer request. After that meeting, Schultz went back to King Lab, typed a written request that plaintiff be transferred and gave that request to Mardis at the Central Office. Schultz's request indicated that it was "based on recent events which have occurred at King Lab." Murphy brought the request before the School Board the following Monday, December 15, 2003. The Board deferred to the Administrator, and plaintiff was transferred effective December 18, 2003. Plaintiff was told of this transfer on December 17, essentially making the transfer effective immediately. A letter from Mardis to plaintiff informing her of the transfer indicated that the decision was based on the fact that plaintiff's "interactions with the principal, colleagues, and parents have not demonstrated teamwork, have damaged the school culture, and have created a distraction to the instructional program."

## DISCUSSION

In her amended complaint, plaintiff alleges that she was transferred in retaliation for exercising her First Amendment right to speak about matters of public concern. Specifically,

4

plaintiff alleges she was transferred for expressing her views against NCLB. Defendants have moved for summary judgment, arguing that there are no disputes as to any material fact and that they are entitled to judgment as a matter of law. As the moving parties, defendants bear the burden of proving absence of any disputed issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court views the facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. Id.

Plaintiff can establish a prima facie case of First Amendment retaliation by showing: (1) her speech was constitutionally protected; and (2) it played a substantial or motivating factor in defendants' decision to retaliate against her. Carreon v. Illinois Department of Human Services, 395 F.3d 786, 790-91 (7th Cir. 2005) (citing Gustafson v. Jones, 290 F.3d 895, 906 (7th Cir. 2002)). If plaintiff establishes these elements, the burden shifts to defendants to prove by a preponderance of the evidence that they would have taken the same action in the absence of the protected speech. Id. at 791.

A two-part test is used to determine whether speech is constitutionally protected. Id. See also, Connick v. Myers, 461 U.S. 138 (1983). First, speech is protected only if it addresses a matter of public concern, which depends on the "content, form, and context of the speech as revealed by the whole record." Id. (quoting Sullivan v. Ramirez, 360 F.3d 692, 698 (7th Cir. 2004). Content is the most important of these three elements. Id. The public concern element must relate to a community concern and is not satisfied by merely a personal grievance of interest only to the employee. Id. "At bottom, we must decide whether the speech is most accurately characterized as an employee grievance, or as a matter of political, social or other concern to the community." Id. (quoting Cygan v. Wisc. Dep't of Corr., 388 F.3d 1092, 1099 (7th Cir. 2004)).

Second, if the speech addresses a matter of public concern, defendants may "restrict the speech if [they] can carry [their] burden of proving that the interest of the public employee as a citizen in commenting on the manner is outweighed by the interest of the [District] as employer in promoting effective and efficient public service." Pickering v. Board of Education, 391 U.S. 563 (1968); Carreon, 395 F.3d at 791. This test has been referred to as the Pickering balancing test. Whether speech is constitutionally protected is a question of law for the court. Carreon, 395 F.3d at 791.

In the instant case, plaintiff's speech, both the skeleton and the notes placed thereon, was an expression of her views on the NCLB. NCLB is a controversial statute that has been the subject of much criticism and debate and is unquestionably a matter of public concern. Defendants do not argue otherwise. Instead, defendants argue that the undisputed facts demonstrate that their interests as an employer in promoting efficiency outweighs plaintiff's interests in commenting on the Act.

When performing the Pickering balancing test, the court considers a number of factors, including: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision making; and (7) whether the speaker should be regarded as a member of the general public. Bonds v. Milwaukee County, 207 F.3d 969, 981 (7th Cir. 2000).

Defendants argue that plaintiff's speech caused a "severe riff among King Lab staff and was a significant source of friction and lack of cooperation among the teachers." Whether such a riff really occurred, however, is disputed by plaintiff. There is ample evidence to suggest that only one teacher was substantially upset with the display, and that that teacher might have been overreacting. Indeed, there is little evidence in the record that is undisputed, except for the fact of the display and the resulting memos back and forth between the parties. The truth of the statements made in those memos is hotly contested, with evidence in the record to support plaintiff's position that the display caused very little disruption in the daily activities of the school. Defendants also argue that plaintiff's speech caused "considerable public embarrassment," justifying the transfer. See Greer v. Amesqua, 212 F.3d 358 (7th Cir. 2000). The evidence shows, however, that unlike in Greer, it was defendants' transfer of plaintiff that caused the publicity. Plaintiff offers evidence showing that she did nothing to publicize her speech until after defendants or other employees brought the incident public.

Moreover, defendants do not even suggest that the other Bond factors (whether the employment relationship requires loyalty; whether the speech impeded plaintiff's ability to work; and the time and place of the speech) weigh against plaintiff and in favor of defendant. Defendants do object to the "manner" of the speech, arguing that it was overtly racist. Yet the facts in the record to date show that only three persons (out of 90) objected to skeleton and jersey. "Pickering balancing is not an exercise in judicial speculation." Gustafson, 290 F.3d at 909. The instant record is far from free of material factual dispute. Those few facts that are undisputed in this case (and there are very few) do not establish that defendants' interests

7

outweigh plaintiff's interest in speaking out on a matter of public concern. Accordingly, the court concludes that plaintiffs speech is constitutionally protected.

Indeed, defendants' primary position is not that their interests as an employer outweigh plaintiff's interest in speaking, or that the speech is not protected, but that plaintiff's speech played no part whatever in the decision to transfer her. Defendants argue that plaintiff was transferred as the result of a personality conflict between her and Schultz and Mutchnick, culminating in plaintiff's December 11, 2003, memo to Schultz. According to defendants, school administrators felt that the letter to Schultz exhibited insubordination. Yet, Helen Mardis, the Human Resource director who actually effectuated the transfer, testified that plaintiff was transferred because of the "chaos" created "as a result of some activities with [plaintiff], and Simms and Sprengelmeyer," meaning that the transfer was a result of the speech. Indeed, Mardis did not even know of the December 11, 2003, letter. This evidence is sufficient to create a question of fact as to whether plaintiff's speech played a motivating factor in the decision to transfer her, requiring denial of the motion for summary judgment.

Finally, the individual defendants argue that they are entitled to qualified immunity. As the Seventh Circuit stated in Gustafson, 290 F.3d at 911, however,

> A public employer may not retaliate against an employee who exercises his First Amendment speech rights, including in particular through a transfer to a less desirable position. . . . Indeed this court held as early as 1979 that a public employer may not retaliate against an employee's exercise of first amendment rights by retaliatory transfer to a different position, even if there is not loss of pay, seniority or other rights. McGill v. Bd. of Educ. of Pekin Elem. School Dist. No. 108, 602 F.2d 774, 780 (7th Cir. 1979).

If defendants transferred plaintiff because of her expression of her opinion of the NCLB, they violated well established law and are not entitled to qualified immunity.

8

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment on plaintiff's claim for First Amendment retaliatory transfer is denied.

**ENTER:** **May 19, 2005**

Robert W. Gettleman
**United States District Judge**

9